UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JANET THAMES, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) 1:09-cv-1041-SEB-TAB ) |
| ST. VINCENT STRESS CENTER, a division of St. Vincent Hospital and Health Care Center, Inc., | ) ) ) ) |
| Defendant. | ) ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 19], filed on July 26, 2010, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1. Plaintiff, Janet Thames, brings this claim against her former employer, Defendant, St. Vincent Hospital and Health Care Center, Inc. ("St. Vincent"),[1] for its allegedly discriminatory actions toward her based on her disability, in violation of the Americans With Disabilities Act ("ADA"), 42, U.S.C. § 12101 *et seq*. For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment.

---

[1] Defendant contends that it is improperly identified in the caption as "St. Vincent Stress Center, a division of St. Vincent Hospital and Health Center, Inc.," but has not moved to amend the caption.

**Factual Background**

Defendant operates the St. Vincent Stress Center ("Stress Center"), a healthcare facility providing assistance to patients suffering from a range of problems, including depression, anxiety, alcohol and drug issues, and family concerns. The Stress Center offers both inpatient and outpatient services for children, teens, adults, and seniors on a confidential and individualized basis.

On July 15, 1997, Ms. Thames submitted an application for employment with St. Vincent as a Mental Health Clinician at the Stress Center. During the interview process, she disclosed that she suffers from congenital cataracts, a condition marked by a clouding of the lens of the eye that is present at birth. According to Ms. Thames, her condition is "static," meaning that it is neither improving nor declining with age. She reports that she is able to see 20/200 with corrective lenses, wears contact lenses on a daily basis, and uses glasses to read.

**Plaintiff's Job Duties at St. Vincent**

On October 13, 1997, St. Vincent hired Ms. Thames as a Mental Health Clinician on a "prn," or "as needed" basis. In 1998, she became a part-time employee, working the 7:00 a.m. to 3:00 p.m. shift at the Stress Center, and her job duties included supervising and restraining patients, charting, taking vital signs, de-escalating potentially combative patients, notifying nurses if a patient became agitated, and engaging in milieu management (i.e., managing an entire environment and being aware of one's surroundings).

2

As a Mental Health Clinician, Ms. Thames worked at times with combative patients and was under the occasional threat of physical assault. Because of the possibility of such attacks, Ms. Thames was required to be able to perform a maneuver referred to as a "takedown" of a patient. A "takedown" is used when a patient is out of control and the employee must restrain the patient by taking him or her to the ground in order to regain control of the situation. Ms. Thames contends that she was able to perform all functions required of her as a Mental Health Clinician, including performing "takedowns."

**Plaintiff's Placement on a Paid Leave of Absence**

On February 14, 2008, while Ms. Thames was on duty at the Stress Center, Cyndi Anders, a nurse employed by St. Vincent, was attempting to verbally de-escalate a patient who had become a threat to herself and to Ms. Anders. At the time, Ms. Thames was located approximately ten feet away from the confrontation, and Ms. Anders testified by affidavit that she (Anders) attempted to make eye contact with Ms. Thames, that she motioned for help, and mouthed "I need help," because she feared the patient would pull the fire alarm or physically harm herself or someone else. Ms. Anders attempted twice in these ways to communicate non-verbally with Ms. Thames, but without generating any response from her. Ms. Thames has testified that she does not recall seeing Ms. Anders motioning for help, and, although she was aware that something was occurring with Ms. Anders's client, Ms. Thames was not looking directly at Ms. Anders or paying attention to the situation because she herself was involved in a documented one-on-one with a

3

patient, which meant that she was required to remain within arm's length distance of that individual. Ms. Anders's situation was eventually brought under control when she succeeded in getting the attention of another St. Vincent employee who provided the necessary assistance.

Later that day, Ms. Anders reported the incident of Ms. Thames's lack of responsiveness to Mike Mantel, Ms. Thames's supervisor, explaining that she was reporting the incident because she felt she had been in danger given the patient's combative history and due to Ms. Thames's apparent failure to perceive that her assistance was being requested. Shortly thereafter, Mr. Mantel contacted Josh Troutwine, St. Vincent's Human Resources Business Consultant, to advise Mr. Troutwine that Ms. Thames had missed an important visual cue from Ms. Anders, which in his opinion raised safety concerns. When such concerns arise, St. Vincent's human resources department protocol includes recommending a referral of the employee for a "Fitness for Duty" examination to ensure that the associates, patients, and other employees at St. Vincent are provided a safe working environment.

On February 15, 2008, Mr. Mantel informed Ms. Thames that he had "turned [her] into HR" as a safety risk. He further advised Ms. Thames that this referral was made to protect the safety of the patients, other St. Vincent employees, and her own safety in light of the possibility that she had impaired vision. The night before Ms. Thames's next scheduled shift, St. Vincent contacted her and directed her not to report to work. In a subsequent telephone conversation, Mr. Mantel instructed Ms. Thames to report to the

4

Office of Associate Health Promotion ("OAHP") to undergo a fitness for duty examination, informing her that, in the interim, she would be placed on a paid leave of absence.

**Initial Medical Examination and Resulting Work Restrictions**

On February 28, 2008, Ms. Thames underwent an examination by Dr. J. Bowman from the OAHP. After the examination, Dr. Bowman prepared a document entitled "Attending Physician's Evaluation and Statement," ("the Statement") which directed Ms. Thames to visit her personal physician for a determination as to whether, in light of the physical requirements of her position at the Stress Center, there was a "temporary and/or permanent restriction, suggestions for accommodation or other patient medical information to be considered." Exh. 6 to Thames Dep. at 48. On March 13, 2008, Ms. Thames consulted her personal physician, Dr. Paul Frascella, and, following an examination, Dr. Frascella recorded as "Limitations/Restrictions" that "[p]atient[']s best corrected level of vision is 20/200 (right eye). Her low vision is permanent and non-progressive which may limit her in certain aspects of work (ex screen font size) . . . ." Id. at 52-53. Dr. Frascella also completed a form entitled "Return to Work Evaluation / Work Limitations," in which he opined that Ms. Thames could return to work as long as she wore her "corrective lenses as prescribed" and "work[ed] with management to define/adjust [her] work environment as appropriate for [the] job (i.e., change font size, adjustable zoom on monitor, alternate allert [sic] techniques." Exh. 7 to Thames Dep. Though Dr. Frascella had completed his examination of Ms. Thames, he did not

5

immediately return the medical report to OAHP.

Because OAHP had not yet received the documentation from Dr. Frascella by April 9, 2008, Mr. Troutwine telephoned Ms. Thames to check on the status of the matter.[2] During that conversation, Mr. Troutwine informed Ms. Thames that, although he was doing his best to obtain the information required that would allow her to return to work, as of April 10, 2008, she would no longer be on paid leave because she had been allowed sufficient time within which to respond to the employer's request to submit the documentation from her doctor and had failed to do so. Ms. Thames informed Mr. Troutwine that Dr. Frascella possessed the required documentation and would be submitting it to the OAHP. Dr. Frascella finally signed the Statement on April 14, 2008, and two days later the specified work limitations (on April 16, 2008), and submitted the documentation to the OAHP. On April 18, 2008, Ms. Thames reported to the OAHP to retrieve and sign the documents.

On April 24, 2008, Mr. Troutwine sent Ms. Thames a letter summarizing their April 9th telephone conversation, noting that they had had a total of three telephone conversations regarding the delay in receiving documentation from her personal physician. In the letter, Mr. Troutwine reminded Ms. Thames that her compensation had been discontinued effective April 10, 2008, because "sufficient time had been given to [her] to submit the documentation, and it has been several weeks since the process

---

[2] Mr. Troutwine had also telephoned Ms. Thames on two occasions prior to April 9, 2008 to discuss the status of the documentation from her personal physician.

began." Exh. 8 to Thames Dep.

**Defendant's Request for Additional Medical Information**

On May 12, 2008, Mr. Troutwine sent a second letter to Ms. Thames acknowledging receipt of the required documentation from Dr. Frascella and informing Ms. Thames that St. Vincent required clarification from him regarding her visual acuity. According to Mr. Troutwine, the Return to Work Evaluation / Work Limitations form he had completed was unclear as to whether Ms. Thames was able to perform certain of her duties as Mental Health Clinician, including tasks related to milieu management, physical intervention, and monitoring for patient and environmental safety. Mr. Troutwine requested that Dr. Frascella provide the following specific information with regard to Ms. Thames's ability to perform such functions:

    (i)    Can you perform the type of milieu management, monitoring for patient and environmental safety, and physical intervention and restraint of patients as described in this letter given your vision, including being able to physically defend yourself and recognize a situation that is escalating or already is combative in nature?; and

    (ii)    If you are unable to perform such job duties, confirm whether you might be able to perform the job duties with some type of accommodation and, if so, the nature of all possible accommodations that could allow you to perform the functions in question (explain how each proposed accommodation could help you do your job and whether alternative accommodations could also help you do your job).

Exh. 5 to Troutwine Dep. Ms. Thames was asked to obtain this information and provide it to St. Vincent by May 26, 2008.

The May 12 letter also stated that Ms. Thames could return to work on a temporary

basis pending receipt of the requested information from her physician.  Mr. Troutwine spoke directly with Ms. Thames and explained that she could return to her assigned position and that her return was considered temporary only because he had not yet received the follow-up information from her physician which would allow him to determine what accommodations, if any, were necessary.  Troutwine Dep. at 24-25.

Following her receipt of the May 12 letter, Ms. Thames visited Dr. Frascella to obtain the requested information.  However, Dr. Frascella advised her that "there [was] nothing more [he] could add."  Thames Dep. at 59.

**Plaintiff's Termination**

On May 27, 2008, Ms. Thames attended a meeting with Mr. Troutwine and Kate Settles, Director of Nursing, to discuss alternative techniques for signaling.[3]  To ensure a safe working environment, St. Vincent decided to permit Ms. Thames to return to work in a peer-populated work area, which meant she was required to be in the line of sight of a co-worker at all times in the event she needed to signal for help.  According to Ms. Thames she "was offered a temporary, part-time position with other associates being around [her] at all times to ensure safety."  Thames Dep. at 68.  Although she did not request one, St. Vincent also provided Ms. Thames with a Microsoft wireless optical mouse for magnification of computer screen font size as Dr. Frascella had suggested in

---

[3] At the time this meeting was held, St. Vincent had not yet received the follow-up response it had requested from Ms. Thames's physician regarding suggested accommodations, if any.

8

his original report.

At the May 27 meeting, Ms. Thames agreed to work her scheduled shifts on May 30 and May 31, 2008. However, on May 29, 2008, Ms. Thames telephoned Mr. Troutwine to notify him that, on the advice of her counsel, she would not return to work as was previously agreed. On June 3, 2008, Mr. Troutwine sent Ms. Thames a letter memorializing the discussions at the May 27 meeting and during the May 29 telephone conference. In that letter, Mr. Troutwine requested that Ms. Thames provide the follow-up information from her physician that had been requested no later than June 17, 2008. Although Ms. Thames did not report to her scheduled shifts on May 30 or 31, St. Vincent offered her the opportunity to work ten shifts during the remainder of the month of June 2008. Ms. Thames did not report to work on June 5, which was her first scheduled shift for that month.

St. Vincent's attendance policy provides that "three (3) unexcused absences by an associate are grounds for immediate dismissal." Because Ms. Thames failed to report to work on May 30, May 31, and June 5, St. Vincent treated her failure to return to work as a voluntary resignation, pursuant to its written policy.

**The Instant Litigation**

On May 15, 2008, Ms. Thames filed a charge of discrimination alleging that St. Vincent regarded her as being disabled. On August 24, 2009, Ms. Thames filed this lawsuit, alleging a violation of the ADA by St. Vincent.

## Legal Analysis

**I.     Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325; Doe v. R.R. Donnelley & Sons, Co.,

42 F.3d 439, 443 (7th Cir. 1994).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. Anderson, 477 U.S. at 247-52. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made

11

clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

**II.  Discussion**

Thames contends she was terminated because of her disability, in violation of the ADA. Under the ADA, discrimination is prohibited "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a); Furnish v. SVI Sys., Inc., 270 F.3d 445, 448 (7th Cir. 2001). It is the plaintiff's burden to prove that she is a "qualified individual" under the ADA, to wit, that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [she] holds or desires." Weiler v. Household Fin. Corp, 101 F.3d 519, 524 (7th Cir. 1996) (quoting 42 U.S.C. § 12111(8)). Therefore, before we consider Thames's claim for discriminatory termination under the ADA, we must first assess whether she was disabled within the meaning of the statute.

Under the ADA, an individual has a "disability" if: (1) she has a physical or mental impairment that substantially limits one or more of her major life activities; (2) she has a record of such an impairment; or (3) her employer regards her as having such an

12

impairment. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).[4]  Here, Thames asserts only the third type of disability, namely, that her employer regarded her as having an impairment that substantially limited one or more major life activities.  See Pl.'s Br. at 4 ("[Defendant] regarded [Plaintiff] as being disabled to perform the essential functions of her job when, in fact, she was performing them.") (citation omitted).  Thus, we tailor our analysis to her assertions, and examine only the third statutory definition of disability.

In order to establish that, at the time of her termination, St. Vincent regarded her as disabled under the ADA, Thames must show that St. Vincent mistakenly believed either: (1) that she had a physical impairment that substantially limited one or more major life activities; or (2) that an actual, nonlimiting impairment substantially limited one or more major life activities.  Mack v. Great Dane Trailers, 308 F.3d 776, 780 (7th Cir. 2002). Thames asserts that St. Vincent acted under the second type of misperception, to wit, that it mistakenly believed that her actual, non-limiting vision impairment was substantially limiting in the major life activities of seeing and working.  We address this theory below.

### A.     Major Life Activity of Seeing

In support of her contention that St. Vincent regarded her as substantially limited in the major life activity of seeing, Thames points to the fact that, following its

---

[4] On September 25, 2008, Congress amended the ADA's definition of disability.  See § 3 of the ADA Amendments Act of 2008 (September 25, 2008).  However, Section 8 of this statute provides that the legislation's effective date is January 1, 2009, and the alleged act of discrimination that occurred here took place before that date.  Therefore, the new definition does not apply because we "use the laws and interpretations that were in force when the complained-of acts occurred."  Kiesewetter v. Caterpillar, Inc., 2008 WL 4523595, at *1 (7th Cir. Oct. 9, 2008) (citing Landgraf v. USI Film Products, 511 U.S. 244 (1994)).

investigation into the February 14, 2008 incident, St. Vincent concluded that she had not been able to see the visual cue from Anders and requested that she (Thames) undergo a fitness for duty examination before returning to work. However, requiring an employee to submit to a medical examination to establish fitness for duty when there is a legitimate concern about the employee's ability to perform a specific job does not, standing alone, establish that the employer regarded its employee as being disabled. See Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000). "A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. A covered entity may make inquiries into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c); see also 42 U.S.C. § 12112(d)(4)(A). Under Seventh Circuit law, an employer may make such an inquiry "when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition." Coffman v. Indianapolis Fire Dep't, 578 F.3d 559, 565 (7th Cir. 2009).

Here, the request that Thames submit to a medical evaluation was based on St. Vincent's concern following the February 14, 2008 incident that Thames's known vision impairment might hamper her ability to perform essential job functions and could even pose a threat to her safety or the safety of her co-workers. We see nothing unreasonable about this concern in light of the required physical exertions for a Mental Health

14

Clinician. Moreover, because Thames's visual acuity was essential to her ability to perform her job appropriately and safely, we find that it was not unreasonable for St. Vincent to require her to collect additional clarification from her physician after receiving his original report and finding it lacking in certain respects. See id. at 565-66 (concluding that repeated fitness for duty examinations of a fire fighter were reasonable in the context of the job environment).

St. Vincent's requirement that Thames complete a fitness for duty examination merely establishes that Defendant harbored some doubt as to her ability to perform particular essential functions of her job, but such doubt alone does not establish or demonstrate that St. Vincent regarded Thames as disabled. It is true that, "[t]he results of [an] evaluation . . . may indicate the employer's perception of the employee's ability to function on the job and thus provide some evidence that the employer regarded the employee as disabled." Krocka, 203 F.3d at 515. However, here, there is no such indication. After reviewing the results of Thames's initial evaluation, St. Vincent allowed her to return to her regular position on a temporary basis contingent upon obtaining additional information from her personal physician.

St. Vincent's request that Thames obtain additional information while it allowed her to continue working, albeit under supervision, does not establish that Defendant regarded Plaintiff as being disabled. Instead, the fact that St. Vincent allowed her to return to work in some capacity pending receipt of additional information from her

personal physician supports the inference that Defendant did not regard her as disabled. Even in the absence of the requested information from Thames's doctor, St. Vincent continued to include her on the work schedule. It was Thames, herself, who voluntarily stopped reporting for her scheduled shifts. These uncontroverted facts prevent us from concluding that St. Vincent regarded her as disabled at the time the challenged employment decision was made.

The only other argument Thames advances in support of her contention that St. Vincent regarded her as being disabled is that Defendant described her as "a legally blind Mental Health Clinician" in its brief in support its motion for summary judgment. This assertion appearing as it does only in a lawyer's brief submitted to this Court long after the complained-of acts occurred is not evidence to prove that Defendant regarded Plaintiff as having a disability at the time it made the allegedly discriminatory employment decision.

### B. Major Life Activity of Working

Next, Thames argues that St. Vincent regarded her as being substantially limited in the major life activity of working. When working is the major life activity at issue, it is not enough for a plaintiff to establish merely that her employer believed her impairment significantly restricted her ability to perform a specific job; instead she must show that her employer believed her condition significantly restricted her ability to perform a broad class of jobs. See Fredricksen v. United Parcel Serv., Co., 581 F.3d 516, 523 (7th Cir.

2009).

Thames contends that St. Vincent believed she was substantially limited in her ability to perform a broad class of jobs because, although she applied for other positions with St. Vincent, it "never responded to her applications, even though she was qualified for each position" and "never tried to get [her] to perform another job in any other of its departments, or otherwise offered her another position." Pl.'s Resp. at 5. Thus, Thames argues that "the logical conclusion is that defendant regarded plaintiff as being unable to perform a broad class of jobs." Id. However, as St. Vincent highlights, Thames fails to identify any jobs for which she applied, to provide a timeframe for when she filed her applications for them, or to designate evidence establishing that she was actually qualified for those other positions. This dearth of evidence forecloses a finding that St. Vincent regarded Thames as being disabled in the major life activity of working.

### III. Conclusion

Because we find that Plaintiff has failed to present sufficient evidence to demonstrate a genuine dispute of material fact as to whether Defendant regarded her as disabled, we GRANT Defendant's Motion for Summary Judgment on her ADA claim. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____12/09/2010_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Stephen Arthur Gross
sgrosslaw@sbcglobal.net

John Patrick Ryan Jr.
HALL RENDER KILLIAN HEATH & LYMAN
jpryan@hallrender.com

Craig Warner Wiley
HALL RENDER KILLIAN HEATH & LYMAN
cwiley@hallrender.com